### UNION NATIONAL BANK OF CHANDLER, Appellee,

v.

### BANCFIRST (SEMINOLE), Formerly First National Bank of Seminole, Appellant.

#### No. 75888.

Supreme Court of Oklahoma.

Nov. 10, 1993.

Rehearing Denied April 19, 1994.

Dan A. Erwin, Erwin, Butts & Lenora, P.C., Chandler, for appellee.

Johnston, McMains & Walker by Larry Jay McMains, Seminole, for appellant.

HODGES, Chief Justice.

Webb Metals was incorporated with Robert and Denise Webb as the officers, directors and shareholders. On March 5, 1985, Webb Metals executed a security agreement in its accounts receivable in favor of First National Bank of Seminole. First perfected its interest in Webb Metals' accounts receivable on August 9, 1985.

Webb Metals began experiencing financial problems and defaulted on bonds held by, among others, appellant Bancfirst (First), formerly First National Bank of Seminole, and appellee Union National Bank of Chandler (Union). The bondholders met and agreed on a plan to refinance the ailing company. First and Union both agreed to be participants on the building and equipment loans as part of the refinancing agreement. However, there is no evidence that the refinancing plan included Webb Metals' accounts receivable. In fact, there is no evidence that the accounts receivable were even discussed at the reorganizational meeting. Thereafter, Webb Expanded, Inc., was formed. Like Webb Metals, Webb Expanded's officers, directors and shareholders were Robert and Denise Webb. Robert Webb managed both companies.

In April 1987, Webb Expanded granted a security interest in its accounts receivable to Union which Union perfected. Robert and Denise Webb and Webb Metals were guarantors on the note. First did not participate in the accounts receivable loan to Webb Expanded.

Webb Metals and Webb Expanded shared many of the operational tasks. For instance, the orders were received by Webb Metals who would type a job sheet. Most of the processing capabilities were at the Webb Metals' facility. Webb Metals and Webb Expanded shared equipment and employees to produce the goods. In fact, the product generally was produced and shipped from the Webb Metals facility. When Webb Metals started experiencing increased financial problems, some of the equipment was moved from the Webb Metals facility to the Webb Expanded facility without any payment for the equipment.

After the product was complete, Webb Metals facility generated duplicate invoices. The first invoice was from Webb Metals to Webb Expanded, and the other was from Webb Expanded to the customer. Robert Webb would send the first invoice to First and borrow from First against it, then send the second invoice to Union and borrow from Union against it. The two invoices were identical in terms of quantities, weights, job numbers, order numbers, and the end user. There were only minor differences in price. Therefore, First was advancing funds on invoices for the same products as Union was advancing funds.

Robert Webb testified that the invoicing arrangement was done at the suggestion of Louis Intres, the president of First. Specifically, Webb testified that Intres suggested that Webb Metals sell its product to a company that could pay cash. Webb replied that the only company that could pay cash was Webb Metals. Intres then suggested that Webb Metals sell to Webb Expanded.

The finished product was shipped to the customer from the Webb Metals facility. Payment was made by the customer to Webb Expanded through a "lockbox" arrangement. The payment was sent to a mailbox. An employee of Union would pickup the payment. Union would retain the eighty per cent that it had advanced on the invoice and forward the remaining twenty per cent to Webb Expanded. Likewise, no payments were made to First on the invoices.

After the president of First became suspicious of the financing procedures of Webb Metals, First negotiated an agreement with Webb Metals to have the payments on the invoices made directly to First. A few months later the president of First called Union and told Union that he thought that Webb Metals and Webb Expanded were double invoicing for the same product. In response, Union sent a verification to some of the customers to determine if they did indeed owe the amount on the invoice. After receiving positive responses, Union was satisfied that the two companies were not double invoicing.

When Webb Metals became insolvent, Union purchased some of its equipment which it then leased to Webb Expanded. Thereafter, Webb Expanded commenced bankruptcy proceedings. The petition for bankruptcy was captioned "*In re*, Webb Expanded, Inc., a/k/a Webb Expanded Metals, a/k/a Webb Metals."

The bankruptcy stay was lifted so that Union could file suit in the district court. In district court, Union asked that its interest in Webb Expanded's accounts receivable be declared superior to Webb Metals' interest. First counterclaimed presenting claims for tortious interference with business and contractual relationship, conversion, and misappropriation of funds. The district court found that Webb Expanded and Webb Metals were separate entities and that Union's interest was superior to First's interest in Webb Expanded's accounts receivable.

On appeal, First has not raised any issues associated with the counterclaims. Therefore, the only issue before this Court is the superiority of Union's security interests in Webb Expanded's accounts receivable.

An analysis of that issue necessarily begins with Article 9 of the Uniform Commercial Code, Okla.Stat. tit. 12A, § 9–101—9–507 (1991). Pursuant to sections 9–102 and 9–106, accounts receivable fall under the um-

brella of Article 9. On first glance, it appears that section 9–306(2) applies to the present facts. Section 9–306(2) addresses whether a security interest continues in collateral following disposition, such as a transfer, of the collateral. However, this is not the type of transfer contemplated by section 9–306(2). On closer observation, the transaction is actually a change in corporate structure. *See Bank of the West*, 852 F.2d 1162 (Okla.1988); *In re Cohutta Mills, Inc.*, 108 B.R. 815 (Bankr.N.D.Ga.1989).

In *Bank of the West*, a beverage business of one wholly-owned subsidiary, Boles & Co., Inc. (BCI), was transferred to another wholly-owned subsidiary, Allied Canners & Packers, Inc. (Allied). Bank of the West had a security interest in Allied's "'present and hereafter acquired' accounts, inventory, and proceeds." CCFS had a security interest in BCI's present and after-acquired accounts and sought to extend that interest to include Allied's accounts.

Applying section 9–402(7), the court found CCFS's perfected security interest continued in the transferred collateral and "in the property acquired [by Allied] in the four months after the transfer" and was "superior to Bank of the West's interest during this period, even though Bank of the West's interest also [was] perfected." The court noted the following factors it considered in determining section 9–402(7) applied. There was no change in the way the beverage business was conducted after the transfer. After the transfer, Allied used invoices with BCI's heading. The personnel were unsure whether Allied or BCI was operating the beverage business. The court concluded that the "transfer" was actually "a change in the corporate structure of the debtor."

In *Cohutta Mills*, King's Tuft's owners created Cohutta Mills as part of a restructuring plan designed to alleviate King's Tuft's financial problems. As part of the restructuring agreement Kings' Tuft's assets were transferred to Cohutta Mills. The Small Business Administration, which had a security interest in King's Tuft's equipment, machinery, and after-acquired property, sought to extend the security interest to Cohutta Mills' assets.

Based on the facts that the two corporations had the same president, pursued the same line of business, and used the same machinery and equipment, the court found that "King's Tuft essentially became Cohutta Mills as a result of the transactions." The result was a change in corporate structure, not merely the transfer of assets. Thus, section 9–402(7) was the applicable statute.

■ Webb Expanded was created as part of the restructuring of Webb Metals. The accounts receivable were transferred from Webb Metals to Webb Expanded through the double invoicing scheme. Some of Webb Metals' equipment was transferred to Webb Expanded without Webb Expanded paying any consideration. The two companies were operated as one company. Webb Metals and Webb Expanded shared equipment and employees. The bookkeeping for both companies was done at the Webb Metals' facility by the same employees. The board of directors was the same for both companies, as was the manager. When Webb Expanded filed for bankruptcy, it listed Webb Metals as one of its other names. Further, Union had knowledge of First's security interest in the accounts receivable. Union also knew Robert Webb intended to use the Webb Expanded facility to produce the same product as Webb Metals was producing.

As in *Bank of the West* and *Cohutta Mills*, Webb Metals and Webb Expanded were essentially the same company with Webb Metals carrying on some of its business as Webb Expanded. Thus, the result of the transactions was a change in corporate structure, and section 9–402(7) applies.

Section 9–402(7) addresses a change in corporate structure or in name and provides that a security interest remains perfected after such a change. Section 9–402(7) provides:

> Where the debtor so changes his name, or in the case of an organization, its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four (4) months after the change, unless a new appropriate fi-

nancing statement is filed before the expiration of that time. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

Okla.Stat. tit. 12A, § 9–402(7) (1991). Comment 3(8) to section 402 states:

Subsection (7) also deals with a different problem, namely whether a new filing is necessary where the collateral has been transferred from one debtor to another.... This Article now answers the question in the negative. Thus, any person searching the condition of the ownership of a debtor must make inquiry as to the debtor's source of title, and must reach in the name of the former owner if circumstances seem to require it.

Comment 8 to section 402 states:

[H]owever, the general principle sought to be achieved by the subsection is that after a change which would be seriously misleading, the old financing statement is not effective as to new collateral acquired more than four months after the change, unless a new appropriate financing statement is filed before the expiration of the four months. The old financing statement, if legally still valid under the circumstances would continue to protect collateral acquired before the change and, if still operative under the particular circumstances, would also protect collateral acquired within the four months.

Thus, if the financing statement filed by First was not seriously misleading, First retained a perfected security interest in Webb Expanded's accounts receivable as well as those of Webb Metals.

■ What is required by the code is accuracy sufficient to reasonably put a third party on notice that further inquiry is needed. In this case, Webb Metals changed its name to Webb Expanded. This is different than the case where a company's new name in no way resembles its former name causing it to be seriously misleading. Because in this case the change was not seriously misleading, First was not required to refile or amend its financing statement to maintain a perfected security interest in Webb Expanded's ac-

counts receivable. Under section 9–402(7), First had a perfected security interest in the accounts receivable of both Webb Metals and Webb Expanded.

■ Under section 9–312(5), "conflicting security interests rank according to priority in the time of filing or perfection" whichever occurred earliest. Because First filed its financing statement before Union and, pursuant to section 9–402(7), First's interest remained perfected through the change in structure, First has a security interest superior to Union's in Webb Expanded's accounts receivable.

The trial court's judgment is reversed. The cause is remanded with instructions for the trial court to enter judgment in accordance with this opinion.

REVERSED; REMANDED WITH INSTRUCTIONS.

SIMMS, ALMA WILSON, SUMMERS and WATT, JJ., concur.

OPALA and KAUGER, JJ., concur in part, dissent in part.

LAVENDER, V.C.J., dissents.

HARGRAVE, J., not participating.